IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

TONDA SUSAN BOHRINGER,

                                                    OPINION AND ORDER
                    Plaintiff,
                                                         12-cv-718-bbc
        v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

        Plaintiff Tonda Susan Bohringer has moved for judicial review of the final decision of defendant Carolyn W. Colvin, Acting Commissioner of Social Security, denying plaintiff's application for disability insurance benefits and supplemental social security.   Plaintiff contends that the administrative law judge who heard her appeal erred in finding that she was not disabled but could perform jobs that exist in significant numbers in the national economy, specifically by not giving controlling weight to the opinions of plaintiff's treating physician, who found her unable to work eight hours a day.

        I conclude that the administrative law judge was not bound to adopt the opinion of plaintiff's treating physician because that opinion was not supported by the medical evidence and was inconsistent with other evidence in the record.   I conclude also that the record evidence supports his finding that plaintiff has the residual functional capacity to work at a sedentary exertional level and that jobs exist in the national economy that are within her

1

ability to perform.  Accordingly, I will enter judgment in favor of defendant.

RECORD FACTS

A. Background

Plaintiff was born in 1972 and was 36 when she filed her application for benefits, claiming that she had been disabled since April 1, 2007.  She had a ninth grade education and had been in special education for all classes.  Her past work included working as a charter driver, a bus driver, a general laborer and a short-order cook.  Since 2007, she had worked part-time as a waitress at a restaurant owned by a relative.  Administrative Record at 46.

Plaintiff filed her applications for disability insurance benefits and supplemental security income on May 2, 2008.  The applications were denied initially on August 23, 2008 and again on December 8, 2010, after plaintiff sought reconsideration.  Plaintiff requested a hearing and one was held on May 12, 2011, before administrative law judge Sylke Merchan.  Plaintiff was represented by counsel and testified on her own behalf.  The only other witness was the vocational expert, Stacia Star.

The administrative law judge found that plaintiff was not eligible for benefits because she could still perform substantial gainful work.  This decision was upheld by defendant on August 7, 2012.

B. <u>Medical Evidence</u>

1. <u>Dr. Susan Stepanski</u>

According to the record, plaintiff saw her treating physician, Dr. Stepanski, at least 17 times between August 2005 and July 2010. As relevant, the visits included the following.

March 12, 2007: Plaintiff came in with a complaint of chronic back pain. AR 302. Plaintiff said she had had epidural injections without improvement and that she was getting numbness down her left leg. Stepanski found her morbidly obese, noting that she had gained 30 pounds over the past year. Plaintiff also reported sinus congestion and depression that kept her from sleeping. <u>Id</u>. She had no problems with either straight or reverse leg raising. <u>Id</u>.

May 2007: plaintiff came in to discuss disability and a rash and pain in her lower back and extremities, for which she was seeing a rheumatologist AR 300. (The record does not disclose the name of the rheumatologist or include any records of visits to any rheumatologist before May 2007.) Plaintiff said she had gained weight because she was unable to exercise and that she was fatigued. <u>Id</u>. Stepanski found that plaintiff's weight was 281 and that her past medical history included asthma, depression, lupus with rashes and joint pain and GERD. (Gastroesophageal reflux disease, <u>Stedman's Medical Dictionary</u> at 80-1 (28th ed.)). Plaintiff was alert and oriented; she had an erythematous (redness caused by capillary dilation, <u>Stedman's</u> at 601) rash that extended over her chest, face, arms and legs; good range of motion, but pain with movement; and forward bending to only 90 degrees without pain. Stepanski's assessment was lupus undifferentiated, carpal tunnel,

3

obesity, chronic diarrhea, GERD, onychomycosis (fungus infection of nails, Stedman's at 1367), chronic low back pain and history of congenital abnormality of genital organs. Id. (It appears that Stepanski filled out a disability form that day, because two state agency physicians referred to it in their reports, AR 364 & AR 406, but it is not part of the record filed with the court.)

June 27, 2007: plaintiff came in with multiple problems, including ankle swelling, lupus and increased GERD. AR 335. Stepanski assessed plaintiff as having positional dyspnea (shortness of breath, Stedman's at 601), peripheral edema, obesity and lupus. Stepanski advised her to reduce her coffee and soda intake, exercise and continue with her lupus medications. Id.

April 15, 2008: plaintiff came in for blood work relating to her lupus. AR 330. She complained of being overly tired. Stepanski could find no apparent reason for the fatigue and ordered a full set of lab work. She advised plaintiff to follow up with her rheumatologist. Id.

October 21, 2008: plaintiff came in with complaints of cysts in her ovaries, right lower quadrant pain and pain in her right wrist that had started when she lifted a 50-pound bag of dog food a few days earlier. AR 439. (The cysts were later removed surgically. AR 418-19.) Stepanski found plaintiff's hands equal in grip and strength. Id. She told plaintiff to increase her fluids, wear wrist splints nightly and do stretching exercises. Id.

January 14, 2009: plaintiff came in with complaints of neck and back pain and constant headaches. AR 438. Stepanski noted paraspinal muscle spasm in plaintiff's lower

lumbosacral area.  She recommended that plaintiff increase her fluids, increase her range of motion, have physical therapy and a deep tissue massage.  Id.

August 18, 2009: plaintiff came in with a complaint of right arm pain that had been increasing in intensity.  AR 431.  Stepanski noted "paraspinal muscle spasms on the right trapezius but no gross deformity of upper extremities especially on the right where she is complaining of the pain."  Id.

July 22, 2010: plaintiff came in with complaints of sharp pains in her back and difficulty with her legs.  AR 426.  Stepanski planned to follow up with a rheumatologist.  Id.

In a May 2011 Lupus Treating Source Statement sent to the state social security office, AR 527-34,  Dr. Stepanski noted that plaintiff had the following clinical findings for systemic lupus erythematosus: molar rash, photosensitivity, arthritis, positive test for ANA (antinuclear antibody, Stedman's at 70) at any point, gastrointestinal complaints with diarrhea, constipation, abdominal cramping, nausea, vomiting, urinary urgency and incontinence, severe fatigue, severe malaise, muscle weakness, antinuclear antibody, poor sleep, migraine headaches, Sjogren's syndrome (dryness of mucous membranes, purpuric spots on the face and bilateral parotid enlargement, often associated with rheumatoid arthritis, Stedman's at 1914), peripheral neuropathy, hair loss and Raynaud's phenomenon.  AR 527-28.  In addition, she listed GERD and congenital abnormalities; and added that plaintiff had emotional factors that contributed to the severity of her symptoms and functional limitations and that she frequently experienced symptoms severe enough to interfere with her attention, concentration, memory or other cognitive functions.  AR 528.

Stepanski believed that plaintiff could sit for only 15 minutes at a time before she would need to stand and stretch for 15 minutes, AR 529; she could sit for less than six hours each day; she could stand for 30 minutes at a time before she would have to sit in a working position, id.; she would have to remain in the sitting position for 15 minutes before she could stand again, AR 530; she could stand or walk around for less than four hours each day; and she would need more rest than she would have with a morning break, a lunch period and an afternoon break scheduled at approximately two-hour intervals to relieve her pain arising from a documented medical impairment and to relieve fatigue arising from a documented medical impairment. Id. Stepanski also said in the same statement that plaintiff could sit for four hours, stand for two hours and would have to rest for two hours in every eight-hour workday. Id. She could rarely carry anything over 20 pounds, could occasionally carry something 11-20 pounds for less than a third of a workday and could frequently carry one-ten pounds for less than a third of a day. Id. She could rarely bend, stoop, crawl or kneel, AR 531; she could reach, handle or finger only occasionally. Id. In addition, plaintiff suffered from anhedonia, appetite disturbance with weight gain, sleep disturbance and decreased energy. AR 532.

Dr. Stepanski assessed plaintiff's impairments as follows:

- *marked* restrictions of activities of daily living;

- *slight* difficulties in maintaining social functions;

- *extreme* difficulties of concentration, persistence or pace resulting in failure to complete tasks in a timely manner; and
- *repeated* episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to

6

experience exacerbation of signs and symptoms.

AR 532.  According to Stepanski, plaintiff was likely to be absent from work because of her

impairments or treatment for her impairments more than four times a month.  AR 534.


2. Dr. Sheila Patel

Plaintiff saw Dr. Patel in July, August and September 2006.  (Dr. Patel is a doctor at

St. Joseph's Community Health Services, Inc., working in the same clinic as Dr. Stepanski.)

At a visit on July 18, 2006, plaintiff came in for a check up for her lower back pain and

worker's compensation claim.  AR 306.  Patel found that plaintiff's radiculopathy was

improving significantly.  Id.  Patel noted an annular tear at the L4-L5 disk with a diffuse disk

bulge but no nerve root compression, foraminal compromise or central canal compromise.

She recommended that plaintiff continue her decreased activity, follow up at the clinic when

her short-term disability ended and consider surgery only if her symptoms worsened.  She

also suggested epidural steroid injections.  Id.

In August, plaintiff came in, still complaining of back pain and saying that her

improvement had plateaued.  AR 305.  Plaintiff requested a refill of hydroxychloroquin,

which she was taking for lupus.  Patel recommended epidural injections, saying that the

results of those would show whether plaintiff could return to work in mid-September, when

her short-term disability ended.  Id.  In September, plaintiff told Patel she had had her first

injection and that she had felt better within 24 hours.  AR 304.  Patel released plaintiff to

work.

Plaintiff saw Dr. Patel on April 14, 2009 for pain on the right side of her abdomen. AR 433. Patel found plaintiff "quite tender to palpation everywhere, tender in almost all the muscles that I touched." Her shoulders had normal range of motion. Id. Patel assessed fibromyalgia with uncontrolled muscle pain, strain in plaintiff's right pectoralis, chest and abdominal muscles that might to related to her new activity of playing badminton. Id. She recommended that plaintiff start amitriptyline for pain relief for her fibromyalgia, that she do stretching exercises and that she see a therapeutic massage therapist. She gave plaintiff a coupon for a visit to the massage therapist. AR 434.

### 3. Dr. Catherine Wilke

Plaintiff saw Dr. Wilke at St. Joseph's Community Health Services on July 7, 2007, a week after seeing Dr. Patel in the Emergency Department. AR 308. (The record does not contain any report of the emergency room visit.) She told Wilke that her back pain continued, that her medications had not helped and that she had been in physical therapy. Wilke found plaintiff's reaction to palpation over her lumbosacral spine "almost more than would be expected." Id. She suggested an MRI, to be scheduled as soon as possible, and gave plaintiff a note excusing her from work. Id.

### 4. Dr. Kevin Whitney

In response to a request from the state disability determination bureau, Dr. Whitney examined plaintiff for rheumatoid arthritis and chronic low back pain, from which she said

8

she had been suffering for about a year.  He filed a report dated September 27, 2007.  AR
323.  Whitney observed that plaintiff had chronic lupus in her hands.  He wrote that
plaintiff dated the onset of her back pain to June 2006, when she had picked up an
approximately ten pound pallet off the ground at work.  She said that although she had had
some physical therapy, she had done no stretching or strengthening exercises for more than
five months and had done "nothing to assist in the musculoskeletal improvement in her back
pain or her hand pain."  Id.  She described her mobility and flexibility as severely limited by
her pain and said that her medication was not proving any relief.

On examination, Whitney observed extreme tenderness to palpation over plaintiff's
lumbar region and left paraspinal muscle region, "significantly more than would be expected
given her history and complaints of pain."  AR 324.  He found her extreme pain "very
suspicious for malingering or secondary gain type response."  Id.  The remainder of the
examination of her lumbar spine was relatively normal, with good flexion and good strength
in both extremities.  Id.  His examination of plaintiff's hands showed no evidence of
deformities, swelling or inflammation.  She had full range of motion in all of her joints, good
strength and grasp and no signs of motor or sensory deficits in her hand, wrist, elbow or
shoulder.  Id.  She complained of morning stiffness but said she did not experience hand
weakness or decreased grasp strength throughout the day.  Her grasp and fine finger
manipulation were completely normal.  Id.


5. Dr. Carol Danning

Plaintiff saw Dr. Danning at the Gundersen Lutheran Medical Center on May 30, 2008, for a rheumatology consultation, on referral from Dr. Stepanski. AR 354. At the time, plaintiff was complaining of worsening fatigue and increasing pain, with flare ups of increasing pain, particularly in her lower back. She reported trouble sleeping and fatigue upon awakening and alternating diarrhea and constipation. She was trying to lose weight. Id.

Danning noted that plaintiff had an extremely photosensitive rash and some paresthesias (burning or prickling sensation, Stedman's at 1425), in her hands and feet that did not last for any length of time. Id. A musculoskeletal examination of plaintiff showed well preserved range of motion in her shoulders, elbows, wrists, hands, hips, knees and feet with no signs of any synovitis ("Inflammation of a synovial membrane, especially that of a joint," Stedman's at 1920) within her joints. AR 355. Danning found "a lot of exquisite muscular tender points" in the trapezius, the paraspinal, parascapular musculature and lower back paraspinal musculature," but she found that plaintiff had excellent muscular tone and strength "with no focal weakness, including grip strength and muscular tone in her legs." Id. She found only a trace amount of pretibial edema in plaintiff's ankles. The rest of the exam was unremarkable. Id.

Danning's impression was that plaintiff had a history of autoimmune disorder because her symptoms were suggestive of a mild form of lupus. Id. She saw no evidence of any acute disease activity and plaintiff's normal blood counts during the preceding six months suggested that lupus was not the sole cause of her symptoms. Danning thought that plaintiff

10

might have fibromyalgia syndrome, as suggested by her long standing diffuse myofascial pain, a lot of tender points, fatigue, poor sleep quality, irritable bowel syndrome symptoms, paresthesias and edema.  She recommended that plaintiff take either Effexor or Flexeril, but not both, and that she do so every night.  Alternatively, she could use Cymbalta, if she had access to samples of this medication, in place of Effexor for a trial of about two to three months.  She did not recommend any more aggressive immunosuppressive therapy for plaintiff's lupus, although she did suggest plaintiff be more assiduous about staying out of the sun.  Id.  Danning emphasized the importance of an exercise regimen that would involve continued daily walking, along with stretching exercises for plaintiff's tight muscles.  Id.

Plaintiff saw Danning again on September 29, 2010, on referral by Dr. Stepanski for a review of her increased diffuse musculoskeletal pain and a possible flareup of her lupus.  AR 458.  Danning noted that plaintiff had never had full-blown lupus, despite her photosensitive rash, oral ulcers and arthralgias.  Id.  Plaintiff said that she had "pain every where every day."  She hurt in her ankles, hips, knees, shoulders, neck and hands.  She said she hurt after she did anything and even when she was resting.  She told Danning she was still able to work as a waitress 4 1/2 hours a day, four days a week.  AR 458-59.

Plaintiff said she did not sleep well and that she tried to walk half a mile two times a week and stayed busy around her home but did not participate in a lot of other activities.  AR 459.  In addition, she said her rash was worse and she continued to have constant prickling in her arms, hands and legs.  Id.

Plaintiff showed no sign of depressive symptoms or flat affect.  AR 460.  On

11

examination, Danning found plaintiff's range of motion to be "quite good" with full mobility in her shoulders, elbows, wrists, hands, knees, ankles and feet.  Id.  She had a little bit of crepitus in her knees and a little bit of patellofemoral tenderness to her knees but no synovitis throughout her upper and lower extremities.  However, she had a lot of myofascial tender points, especially in the lower back paraspinal musculature but somewhat in the trapezius, paraspinal musculature, elbows and knees.  Id.  Plaintiff had some calf tenderness but did not have Homans sign (pain in the calf when the ankle is slowly dorsiflexed, indicative of thrombosis in the leg veins, Stedman's at 1769).  Her muscular tone was well preserved and Danning observed no focal weakness, including grip strength, proximal and distal limb strength in the upper and lower extremities.  Id.

In Danning's opinion, fibromyalgia was a bigger issue than lupus in plaintiff's diffuse musculoskeletal pain and main symptomology.  She noted the widespread pain, localized to the muscles without any clear-cut evidence of inflammation, muscle weakness or focal neurological deficits so far.  Plaintiff had the classic tenderness, widespread chronic pain and poor sleep quality.  Id.  She thought plaintiff might also have patellofemoral syndrome, as well as chronic bronchitis.

Danning recommended a regular exercise regimen for plaintiff that included stretching exercises for her neck, shoulders, lower back and hamstrings, walking short distances, pool exercises and quadriceps strength training for her knees, an increase in the Gabapentin she was taking and Tramadol for a pain reliever, as needed, along with a muscle relaxant taken two hours before bedtime.  AR 461.

C. Agency Physicians

1. Dr. Syd Foster

In a July 29, 2008 report, Dr. Syd Foster noted plaintiff's primary diagnosis as being lupus, with her secondary diagnosis lumbar spine problems, along with Sjogren's syndrome and joint swelling. AR 357. In Foster's opinion, plaintiff could lift a maximum of 20 pounds occasionally, 10 pounds frequently, sit, stand or walk for about six hours in a normal workday, push or pull without any limitations other than those imposed on sitting and lifting. AR 358. He found no basis for imposing any postural, manipulative, visual, communicative or environmental limitations. AR 359-61.

Foster explained why his conclusions differed from those of plaintiff's treating physician. AR 364. (1) Dr. Stepanski had found on May 8, 2007 that plaintiff had lupus, undifferentiated; carpal tunnel; obesity; chronic low back pain with annular tear and disc bulging, whereas Dr. Whitney had found reason to question the reliability of plaintiff's reports of pain. Whitney found plaintiff's extreme tenderness to simple touching to be suggestive of malingering, particularly when the rest of her examination was relatively normal and she displayed good flexion, strength, reflexes and sensation. Her gait was stable and she could walk on her toes, squat and bend to nearly touch her toes. Id.

(2) In visits to her physician in 2008, plaintiff had blood work and followup on lupus but was neurologically intact with no motor or sensory deficits; she was seen for hand pain, assessed as consistent with carpal tunnel; and she had discontinued her lupus medication. Id.

13

(3) Although the report of plaintiff's May 8, 2007 visit to Dr. Stepanski mentioned depression, the doctor did not include it as a diagnosis, plaintiff was not alleging it as a reason she should receive benefits and she had not mentioned it during the most recent visit included in her file as of Foster's review.  Id.

Foster concluded that plaintiff had the residual functional capacity to perform light work, even with her lumbar disc bulge, complaints of chronic pain and fatigue and a diagnosis of lupus.  Id.  He did not give Dr. Stepanski's statement controlling weight because he found it lacked objective evidence to support the severe restrictions she imposed and it was not consistent with the rest of the file.  Id.  On the other hand, he gave the examining source statement from Whitney a fair amount of weight because the objective findings did not suggest significant limitations, if any, and also because plaintiff was not seeking any type of treatment for back pain and had not been complaining of back pain on her recent visits to her doctor.  Id.

Finally, Foster found plaintiff's reports of back pain only partially credible and her symptoms out of proportion to the objective findings.  Id.  He also noted that plaintiff had stopped taking her lupus medication for some time and had not sought additional treatment or evaluation for the disease.  Id.

2. Eric Edelman

Agency psychologist Eric Edelman prepared a psychiatric review technique form on July 30, 2008, in which he found that plaintiff had an affective disorder that was not severe

in the form of a depressive syndrome characterized only by decreased energy.  AR 365, 368.

He concluded that plaintiff would have mild difficulties in maintaining concentration,

persistence or pace, but no other limitations.  AR 375.  Edelman gave Stepanski's statement

about plaintiff's depression little weight because it was not supported by any objective

evidence, not consistent with the rest of the file evidence and not something plaintiff was

alleging.  AR 377.  Moreover, plaintiff had not reported any depressive symptoms.  Id.

### 3. Dr. Mina Korshidi

Agency physician Dr. Korshidi evaluated plaintiff's physical residual functional

capacity assessment in a report dated December 8, 2010.  AR 401.  She listed primary

diagnoses of lupus, Reynaud's phenomenon and fibromyalgia; secondary diagnoses of L4-L5

disc bulging with low back pain; and other alleged impairments of obesity, kidney issues and

asthma.  Id.  She assessed plaintiff as having the ability to lift 10 pounds occasionally, less

than 10 pounds frequently, stand or walk at least two hours in an eight-hour work day, sit

about six hours in an eight-day workday, push or pull without limitations except those

imposed on her lifting and carrying, AR 402, with no postural, manipulative, visual,

communicative or environmental limitations.  AR 403-05.  She explained her reasons for the

exertional limitations as plaintiff's severe obesity, the absence of her right kidney, her disc

bulge and annular tear, the lack of any listing level impairments in examinations since 2006,

her history of lupus, Raynaud's and fibromyalgia, her going on and off her medications for

those conditions, her generalized arthralgias and myalgias and the absence of any other x-

rays or examinations that had shown severe impairments.  AR 402.  Korshidi listed plaintiff's occasional edema in her hands and lower extremities and noted that plaintiff had always had good strength and range of motion in her spine and extremities and had always been encouraged to exercise.   AR 403.  She concluded that plaintiff's severe impairments established a sedentary exertional level.  Id.

Korshidi found plaintiff's statements credible to the extent they supported a sedentary residual functional capacity.  AR 406.  Apparently she reviewed the May 2007 statement from Dr. Stepanski in support of plaintiff's disability claim that is not in the record, but she gave it little weight.   Stepanski had found plaintiff's functioning severely limited; in Korshidi's opinion, this finding was inconsistent with the examination results, the subsequent medical evidence of record and the objective evidence.  AR 407.

4. Dr. Roger Rattan

Psychologist Roger Rattan reviewed plaintiff's updated file evidence and concluded in a report signed on December 8, 2010 that it contained no allegations or evidence of mental health impairment.  AR 443.

D. Administrative Hearing

Plaintiff appeared with counsel at a May 12, 2011 hearing held before administrative law judge Sylke Merchan.  AR 39.  A vocational expert was also present.  AR 38.  Plaintiff

16

testified that she lived in an apartment in Soldiers Grove, a small village in southwestern Wisconsin.  She was not married and lived with her daughter, who was then 10.  AR 42. Her parents lived nearby and often drove her to the doctor's office or grocery store, although she had a valid license.  AR 43.  They also helped her pay for medication when she needed it.  AR 51.

Plaintiff testified that she had gone to school up to the ninth grade, that she weighed about 250 pounds and that she worked as a waitress at a bar in Soldiers Grove, Wisconsin, and had been doing so since 2009.  AR 43.  She said that she worked about eight to 12 hours a week, that her job required constant lifting of plates and other objects, AR 44, and that she made about $82 a week.  AR 45.  She testified that the bar was owned by a relative and that she could take breaks as needed, AR 46, and another waitress would fill in for her, AR 46, that she missed work about four times a month and that she had to leave early about four to five times a month.  AR 47.  She said that her ten year old daughter did the dishes at home, as well as the laundry, and helped with the vacuuming and dusting.  AR 47.  Her daughter got herself ready for school and made her mother coffee.  AR 47-48.  Plaintiff lived in subsidized housing and received food stamps.  AR 48.  Her parents checked on her each day and helped care for her daughter.  AR 52.

Testifying about her medical condition, plaintiff said that she developed a rash and swelled up when she went out in the sun, AR 49, that she had to put her feet up every day, often before going to work and always after work.  Id.  She saw her doctor once or twice a month at a reduced rate.   AR 50-51.

17

Plaintiff said that her lupus caused her fatigue, joint swelling and fevers and that she had no pain-free days. AR 53. She said that her fibromyalgia caused her to have tight muscles and that she had found no medications that relieved her pain or relaxed her muscles. AR 55. Her doctor was continuing to try new medications and had recently started her on Lexapro, an anti-depressant. AR 56. In addition, her doctor had sent her to specialists, who had tried her on new medications that did not work. AR 57.

Plaintiff also talked about her muscle weakness and inability to sleep, AR 60, her difficulties with the activities of daily living, such as putting on pants or getting into the shower. AR 61. She also described her incontinence, AR 63-64, and said she was unsteady on her feet and needed a cane, although she had not gotten one. AR 63-65.

Vocational expert Stacia Star testified that she had reviewed plaintiff's file and was familiar with the kind of work involved in plaintiff's medium and light exertional jobs with skill levels ranging from semi-skilled to unskilled. AR 69-70. She testified that a person with plaintiff's age, education and work experience able to work at the sedentary exertional level and perform postural activities only occasionally would not be able to work at plaintiff's past relevant work but could perform a number of other jobs, such as surveillance monitor, table worker (an assembly type job that entails putting items into a box and putting it back on a conveyor belt) or assembler, all of which existed in significant levels in the state of Wisconsin. AR 70-71. She said that the jobs could be performed with a sit/stand option and that she knew this from her experience in the field doing job placement for persons who needed that option. AR 71. However, if the person had to be off work at least three days

a month because of her impairments or side effects from medication, there would be no employment options.   AR 71-72.

### E. Administrative Law Judge's Decision

The administrative law judge followed the five-step evaluation process in determining whether plaintiff was disabled.  At the first step, he found that plaintiff had not engaged in substantial gainful activity since 2007 and that she had the severe impairments of lupus, obesity, Raynaud's phenomenon, degenerative disc disease, fibromyalgia and congenital missing kidney.  AR 22.  At the second step, the administrative law judge found that plaintiff's symptoms of fibromyalgia, lupus and obesity constituted severe impairments because they resulted in significant functional limitations.  AR 25.  He did not find plaintiff's complaints of carpal tunnel syndrome problems to be severe impairments, in light of what he said was her failure to mention the problem more than once in the medical records and the findings in the record that she had no sign of muscle atrophy in that area and her grip strength was intact in both wrists.  Id.  He gave no weight to Dr. Stepanski's mention of depression because the diagnosis had been noted only once in plaintiff's medical record and it was not one of plaintiff's claims.  Id.

At the third step, the administrative law judge found that plaintiff's severe impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App. 1, whether considered separately or in combination.  Id.  At the fourth step, he concluded that plaintiff had the residual functional capacity to perform sedentary

work that did not require lifting or carrying more than 10 pounds occasionally and lesser weights more frequently, standing or walking for more than two hours in an eight-hour workday, no more than six hours of sitting in a workday with a sit/stand option, with no climbing of ladders, ropes or scaffolding and the ability to perform all other postural activities no more than occasionally.  AR 26.

The administrative law judge found that plaintiff's lupus was mild in nature and manifested primarily in a positive ANA and photosensitivity.  AR 23.  In reaching this conclusion, he relied on the two reports from Dr. Danning and one from the consulting examiner, Dr. Whitney.  As he observed, Danning's May 2008 report of her rheumatological examination of plaintiff revealed no sign of any lupus overactivity with the exception of a sunburn rash caused by photosensitive reaction.  Neither the physical examination nor the laboratory tests suggested the presence of any acute disease activity or any sign of active synovitis ("inflammation of a synovial membrane, especially that of a joint," or arthritis, Stedman's at 1920).  Id.  In the second report from 2010, Dr. Danning wrote that she was convinced that plaintiff had never had full-blown lupus, but merely some "lupus-like" symptoms, which responded to medication.  She thought plaintiff's problems more consistent with fibromyalgia, without muscle weakness, inflammation or neurological deficit. She noted that plaintiff had good range of motion and full mobility in her shoulders, elbows, wrists, hands, knees ankles and feet, no sign of inflammatory synovitis and that her symptoms improved when she took Effexor.  She recommended that plaintiff increase her medication dosage and perform yoga and stretching exercises, along with walking.  AR 24.

20

Dr. Whitney reported in September 2007 that plaintiff had good lumbar flexion, normal reflexes, a stable gait, full leg strength and good strength and grasp in her hands; that she had more tenderness to touching than would be expected; and that, although plaintiff had complained of chronic hand pain secondary to lupus, Whitney found no problems in her hands and nothing indicative of lupus.  AR 23-24.

The administrative law judge explained why he found Dr. Stepanski's severe restrictions on plaintiff's functional capacity were not entitled to controlling weight, despite Stepanski's role as plaintiff's treating physician.  The restrictions were not reflected in her treatment notes or in the remaining physical evidence; her opinion was internally inconsistent when it came to assessing plaintiff's ability to sit and stand; she wrote that plaintiff could not perform sustained "posturals" (presumably lifting and reaching) and no more than occasional "manipulatives" (presumably handling and fingering), but neither her treatment notes nor any other medical evidence in the record supported these limitations or the marked and extreme limitations in symptoms that she had found.  AR 27.

At step five, the administrative law found that plaintiff was unable to perform her past relevant work, AR 28, but that she could perform jobs that existed in significant numbers in the national economy.  Id.  As required, he considered first whether plaintiff had an underlying medically determinable physical or mental impairment that could reasonably be expected to produce plaintiff's pain and second, the intensity, persistence and limiting effects of the symptoms to determine the extent to which they limited her functioning.  At this step, he concluded that although plaintiff's medically determinable impairments could

reasonably be expected to cause her alleged symptoms, her own statements about the intensity, persistence and limiting effects of the symptoms were not credible to the extent they were inconsistent with his assessment of her functional capacity. He gave a number of reasons for this conclusion. First, plaintiff testified that she rarely left her apartment because of the difficulty of climbing stairs, yet she left the house to go to and from work. Second, he found that the demands of her work as a waitress, "albeit part-time," far exceeded the residual functional capacity he had assessed; third, the consulting examiner (Dr. Whitney) observed apparent pain exaggeration when he touched her pressure points; fourth, no doctor had prescribed anything more than conservative treatments for her lupus or fibromyalgia. Fifth, when plaintiff did take medication it was generally effective in controlling her symptoms from these two disorders. Sixth, she had made attempts to reduce her weight and follow an exercise program in an effort to reduce her fibromyalgia symptoms. Seventh, he found no support anywhere in the medical record for plaintiff's statement that she was so unsteady on her feet that she needed a cane. AR 28.

Plaintiff asked for review of the administrative law judge's June 24, 2011 decision, but her request was denied by the appeals council. The council notified plaintiff of its action in a letter dated August 7, 2012. AR 1-3. Plaintiff filed this action on October 4, 2012.


OPINION

In her challenge to the administrative law judge's decision, plaintiff focuses almost exclusively upon the administrative law judge's failure to give full credit to the opinions of

plaintiff's treating physician, Dr. Stepanski.   She argues that it was error for the administrative law judge to find that she had the residual functional capacity to perform full time sedentary  work because he could make this finding only by ignoring Dr. Stepanski's 2007 and May 2, 2011 opinions.  This, she says, violated the general rule that more weight, even controlling weight, is to be given to the opinions of treating physicians because these doctors have greater familiarity with the applicant's condition and circumstances.   Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003).

Like most rules, the general rule on which plaintiff relies has exceptions.  It applies only if the opinion is "well supported by medical findings and not inconsistent with other substantial evidence in the record."  Id. (citing 20 C.F.R. § 404.1527(d)(2)).  In this case, Dr. Stepanski's opinions do not meet either part of this test.  The medical findings do not support the opinion she reached and they are contradicted by the conclusions reached by other examining doctors.  For instance, as the administrative law judge found, they do not jibe with the conclusions reached by consulting doctor Whitney in September 2007 or the rheumatologist, Dr. Danning, to whom Dr. Stepanski had referred plaintiff in 2008 and again in December 2012.  Neither of these doctors found evidence of active or "full-blown" lupus and, although Danning said that she believed plaintiff had fibromyalgia, the treatment regimen she proposed indicated that she considered the fibromyalgia to be mild in effect and amenable to treatment.

The parties have spent a good deal of time arguing about the internal inconsistency of Dr. Stepanski's 2011 report, in which she said at one point that plaintiff could sit for no

23

more than six hours at a time and stand for no more than 30 minutes, AR 529, and at another point, that plaintiff could sit for no more than four hours a day, stand for no more than two hours and would need two hours of rest time each day.  AR 530.  The administrative law judge found that plaintiff could stand for no more than two hours and sit for no more than 6 hours, with a sit/stand option.  This was a reasonable conclusion to draw from Dr. Stepanski's statement; if anything, it was more favorable to plaintiff than the record warranted, as she admits in her opening brief.  Plt.'s Br., dkt. #13, at 9.

Plaintiff attacks the administrative law judge's decision not to credit Dr. Stepanski's opinion that plaintiff is too disabled to perform even sedentary work, saying that it is not supported by the record.  This contention does not stand up to a review of the administrative law judge's decision, which reveals his careful consideration of the record evidence and his reasons for finding that Stepanski's opinion was not supported by her own treatment notes or by the objective medical evidence.  An administrative law judge need not blindly accept a treating physician's opinion but may discount it if it is internally inconsistent or contradicted by other substantial medical evidence in the record.  Schmidt v. Astrue, 496 F.3d 833, 842 (7th Cir. 2007).  Although the administrative law judge found that plaintiff's lupus, obesity and fibromyalgia were severe impairments, he was not persuaded that they prevented plaintiff from holding down a full-time sedentary job.  Evaluating the intensity, persistence and limiting effects of plaintiff's symptoms, he found plaintiff's testimony not wholly credible.

Although plaintiff argues otherwise, I find that the administrative law judge built "an

24

accurate and logical bridge from the evidence to his conclusion." <u>Steele v. Barnhart</u>, 290 F.3d 936, 941 (7th Cir. 2002).  He gave a thorough explanation for his rejection of Dr. Stepanski's opinion that plaintiff's physical impairments were debilitating.  <u>Skarbek v. Barnhart</u>, 390 F.3d 500, 503-04 (7th Cir. 2004) (administrative law judge "may discount a treating physician's medical opinion if it is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent") (internal citations omitted).  His decision is supported by substantial evidence in the record. Accordingly, I will grant judgment for defendant.


ORDER

IT IS ORDERED that plaintiff Tonda Susan Bohringer's appeal from the denial of her applications for disability insurance benefits and supplemental security income disability benefits, dkt. #1, is DENIED.  The clerk of court is directed to enter judgment for defendant Carolyn W. Colvin, Acting Commissioner of Social Security, and close this case.

Entered this 20th day of June, 2013.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

25